CHAMBERLIN v. COMMISSIONER OF INTERNAL REVENUE (two cases).

TONER v. COMMISSIONER OF INTERNAL REVENUE.

CARL v. COMMISSIONER OF INTERNAL REVENUE.

SCHROCK v. COMMISSIONER OF INTERNAL REVENUE.

PIERCE et al. v. COMMISSIONER OF INTERNAL REVENUE.

Nos. 11693-11698.

United States Court of Appeals Sixth Circuit.

Oct. 14, 1953.

Randolph E. Paul, Washington, D. C., Louis Eisenstein, Washington, D. C., Raymond H. Berry, Ralph W. Barbier, Detroit, Mich., on brief, for petitioners.

Hilbert Zarky, Washington, D. C., H. Brian Holland, Ellis N. Slack, Lee A. Jackson, Washington, D. C., on brief, for respondent.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

MILLER, Circuit Judge.

Petitioner C. P. Chamberlin seeks a review of an income tax deficiency determined by the Respondent for the calendar year 1946, and sustained by the Tax Court. In the Tax Court the proceeding was consolidated with the proceedings of five other taxpayers similarly situated, all of which proceedings involved the same factual and legal questions. The taxpayers, all of whom were stockholders of Metal Moulding Corporation, about which this litigation centers, and their respective deficiencies were as follows:

| | |
|---|---|
| C. P. Chamberlin | $343,650.86 |
| Grace A. Chamberlin, his wife | 63,225.55 |
| John H. Toner | 19,620.37 |
| Benjamin James Carl | 7,244.29 |
| Guy V. Schrock | 9,177.83 |
| Robert and Josephine Pierce | 14,635.19 |

The Tax Court upheld the deficiency assessment in each proceeding. Each of the taxpayers has petitioned for a review; the causes have been consolidat-

ed in this Court; but the record has been made and filed only in the case of C. P. Chamberlin with the agreement, evidenced by an order of this Court, that the decision of this Court in this case shall be the decision of the Court in the other five related cases, with a separate judgment entered in each of the six cases.

The facts in the main are stipulated and are not in dispute. They are set out in detail in the findings of fact of the Tax Court, reported in 18 T.C. 164, to which reference is made for a more detailed statement than will be included in this opinion.

The Metal Moulding Corporation, hereinafter referred to as the Corporation, is a Michigan corporation engaged in the business of manufacturing metal mouldings and bright work trim used in the manufacture of automobiles. It was incorporated on December 2, 1924 with an authorized common capital stock of $25,000, which was increased in 1935 to $150,000, represented by 1,500 shares of $100 par value voting common stock. From 1940 until December 20, 1946, the issued and outstanding common stock totaled 1,002½ shares, of which Chamberlin and his wife together owned 83.-8%. The directors of the corporation from 1940 to February 12, 1946 consisted of C. P. Chamberlin, Grace A. Chamberlin and Edward W. Smith. On February 12, 1946, John H. Toner and Raymond H. Berry were added. On October 11, 1946, Smith died and during the remainder of 1946 the board consisted of the four remaining members. From 1940 to the end of 1946, C. P. Chamberlin was president and treasurer, John H. Toner was vice-president and general manager, and Grace Chamberlin was for various periods vice-president, assistant treasurer, and secretary. Benjamin J. Carl was assistant secretary and treasurer until February 12, 1946.

The business of the Corporation prospered, and after paying substantial cash dividends over a period of years, its balance sheet at the end of the first six months in 1946 reflected total assets of $2,488,836.53 and included in current assets $722,404.56 cash and $549,950 United States Government Bonds and notes.

On December 16, 1946, the Corporation's authorized capital stock was increased from $150,000 to $650,000, represented by 6,500 shares of $100 par value common stock. On December 20, 1946, a stock dividend was declared and distributed of five shares of common for each share of common outstanding, and the Corporation's accounts were adjusted by transferring $501,250 from earned surplus to capital account.

On December 26, 1946, the articles of incorporation were amended so as to authorize, in addition to the 6,500 shares of common stock, 8,020 shares of 4½% cumulative $100 par value preferred stock. On December 28, 1946, a stock dividend was declared of 1⅓ shares of the newly authorized preferred stock for each share of common stock outstanding, to be issued pro rata to the holders of common stock as of December 27, 1946, and the Company's accounts were adjusted by transferring $802,000 from earned surplus to capital account. The preferred stock was issued to the stockholders on the same day. Prior to the declaration of the preferred stock dividend, the Corporation at all times had only one class of stock outstanding.

On December 30, 1946, as the result of prior negotiations hereinafter referred to, all of the holders of the preferred stock, except the estate of Edward W. Smith, deceased, which owned 20 shares, signed a "Purchase Agreement," with The Northwestern Mutual Life Insurance Company and The Lincoln National Life Insurance Company, which instrument was also endorsed by the Corporation for the purpose of making certain representations, warranties and agreements. Under the "Purchase Agreement" 4,000 shares of the preferred stock was sold to each of the two insurance companies at a cash price of $100 per share plus accrued dividends from November 1st, 1946 to date of delivery. Pursuant to the "Purchase Agreement" the holders of the preferred stock, with

the exception of the estate of Edward W. Smith, delivered their stock certificates endorsed in blank to agents of the two insurance companies, who transferred to C. P. Chamberlin as agent for the stockholders funds for the amount of the purchase price, which Chamberlin distributed to the stockholders in proportion to their interests by delivery of his personal checks.

Immediately thereafter, on December 30, 1946, the insurance companies delivered the stock certificates to the Corporation for transfer. The Corporation cancelled the certificates and in lieu thereof issued its certificate dated December 30, 1946 to the Northwestern Mutual Life Insurance Company for 4,000 shares of its preferred stock and its certificate likewise dated December 30, 1946 to the Lincoln National Life Insurance Company for 4,000 shares of its preferred stock. The expenses incident to the sale of the stock, including legal fees, commissions and federal documentary stamps totaled $13,500.22, which were paid by Chamberlin, who in turn was reimbursed by the selling stockholders.

In the latter part of 1945, the Corporation's attorney and Chamberlin discussed with an investment firm in Chicago the possibility of selling an issue of preferred stock similar to the stock subsequently issued. The Corporation had such a large accumulated earned surplus it was fearful of being subjected to the surtax provided for by Sec. 102, Internal Revenue Code, but at the same time Chamberlin, the majority stockholder, was not willing to have the Corporation distribute any substantial portion of its earned surplus as ordinary dividends because his individual income was taxable at high surtax rates. It was proposed that the issuance of a stock dividend to the stockholders and the sale of it by the stockholders would enable the stockholders to obtain accumulated earnings of the Corporation in the form of capital gains rather than as taxable dividends. The investment counselor contacted The Lincoln National Life Insurance Company of Fort Wayne, Indiana, and during October 1946, furnished the Insurance Company financial information relative to the Corporation. On November 7, 1946, a representative of the Insurance Company came to Detroit and made an inspection of the plant and properties of the Corporation. On November 20, 1946, The Lincoln National Life Insurance Company's finance committee approved the proposed issue and the purchase of one-half thereof. The Northwestern Mutual Life Insurance Company was contacted for the purpose of participating in the purchase of the preferred stock. It made a detailed investigation of the Corporation and of the terms and conditions of the proposed preferred stock issue, and about two weeks before December 30, 1946, its committee on investments approved the purchase of 4,000 shares of the preferred stock to be issued, and passed the matter over to its legal department for the conclusion of the transaction.

The preferred stock contained the following provisions among others: The holders were entitled to cumulative cash dividends at the rate of $4.50 per annum payable quarterly beginning November 1, 1946; the stock was subject to redemption on any quarterly dividend date in whole or in part at par plus specified premiums and accrued dividends; it was subject to mandatory retirement in amounts not exceeding 2,000 shares on May 1, 1948 and 1,000 on May 1st on each succeeding year, depending upon the Corporation's net earnings for the preceding year, until fully retired on May 1, 1954; in the event of certain default of dividend payments or annual retirements, the holders were entitled to elect a majority of the directors; as long as any preferred shares remained outstanding the consent of the holders of at least 75% thereof was required to validate certain actions, including changing the articles of incorporation or capital structure, the sale of the Company's property, or the incurrence of indebtedness for borrowed money in excess of a certain amount; the Corpora-

tion could not pay any cash dividend upon any stock junior to the preferred if there was any default in the payment of dividend upon and the annual retirements of the preferred, or if such dividend reduced the net working capital of the Corporation below an amount equal to 150% of the aggregate par value of all outstanding preferred, or $750,000, whichever amount was greater, or reduced the currents assets of the Company to an amount less than 200% of current liabilities. These provisions had been discussed with the Lincoln National Life Insurance Company and some of them, at least, were included in order to satisfy the investment requirements of the two insurance companies.

No agreement of purchase and sale was entered into between any of the petitioners and either of the two insurance companies prior to the "Purchase Agreement" executed on December 30, 1946, but the stockholders and directors of the Corporation took the necessary actions to put the negotiated plan into effect, as hereinabove set out, only after the insurance companies certified their willingness to participate in the purchase, if, as, and when the preferred stock was issued on the terms and conditions prescribed by them and as set out in the Company's charter as amended on December 27, 1946.

In reporting this sale of the preferred stock in their 1946 tax returns, each of the stockholders reported his proportion of the proceeds from the sale as a net long-term capital gain from the sale of a capital asset held for more than six months, used a substituted basis as the cost basis of the preferred stock, and in determining the period the preferred stock had been held included the holding period of the common stock upon which the preferred stock dividend was declared.

The Respondent ruled that the preferred stock constituted a dividend taxable as ordinary income, and further determined that the value was the amount received on the sale of the shares against which the expenses incurred in the sale were a valid deduction. This ruling resulted in the deficiency assessments involved in these consolidated proceedings.

Before considering the ruling of the Tax Court it is well to briefly review some of the Supreme Court decisions involving the taxability of stock dividends. This is well done in Note 5 in the Tax Court's opinion, which, together with the analysis of some of the opinions and the legislative enactments applicable to the problem in Helvering v. Griffiths, 318 U.S. 371, 63 S.Ct. 636, 87 L.Ed. 843, makes a detailed restatement unnecessary in this opinion. In Towne v. Eisner, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 and Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 194, 64 L.Ed. 521, the Court held that a stock dividend of common stock to the holders of the common stock was not income to the stockholder taxable by Congress under the Sixteenth Amendment, in that it did not alter the preexisting proportionate interest of any stockholder or increase the intrinsic value of his holding or of the aggregate holdings of the other stockholders as they stood before. The Court said: "The new certificates simply increase the number of the shares, with consequent dilution of the value of each share" and that a stock dividend "shows that the company's accumulated profits have been capitalized, instead of distributed to the stockholders or retained as surplus available for distribution in money or in kind should opportunity offer." In Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268, the Court held that a stock dividend of common stock to the holders of preferred stock was taxable income because it gave the preferred stockholder an interest different from that which his former stockholdings represented. In Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224, the Court held that a stock dividend in preferred stock to the holders of common stock, where similar preferred stock was outstanding, was taxable income because it gave the common stockholder an interest essentially different from that theretofore represented by his common

stock. In Helvering v. Griffiths, supra, the Court refused to reconsider the ruling in Eisner v. Macomber, supra, holding that legislation subsequent to that ruling did not attempt to make such stock dividends taxable. In Helvering v. Sprouse, 318 U.S. 604, 63 S.Ct. 791, 87 L.Ed. 1029, and in Strassburger v. Commissioner of Internal Revenue, 318 U.S. 604, 63 S.Ct. 791, 87 L.Ed. 1029, the Court restated the rule that in order to render a stock dividend taxable as income there must be a change brought about by the issue of shares as a dividend whereby the proportional interest of the stockholder after the distribution was essentially different from his former interest. The rule was applied to the facts in the Strassburger case where preferred stock was created and distributed as a stock dividend to a stockholder who owned the entire outstanding common stock, the Court holding that the preferred stock dividend did not constitute taxable income.

The Commissioner supported his assessment on the ground that although the preferred stock was issued as a nontaxable dividend, a concerted plan to sell the dividend shares was formulated prior to the distribution of such shares, which, coupled with actual sale immediately after receipt and the payment of the proceeds of sale direct to the stockholders constituted a taxable dividend to the extent of available earnings. He also took the position that the plan and the immediate sale resulted in a change in the proportional interest of the stockholders which was sufficient to exclude it from the rulings in the Supreme Court cases above referred to.

In the Tax Court the petitioner contended that under the rulings in Towne v. Eisner, supra, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372; Eisner v. Macomber, supra, 252 U.S. 189; Helvering v. Griffiths, supra, 318 U.S. 371, 63 S.Ct. 636, and Strassburger v. Commissioner, supra, 318 U.S. 604, 63 S.Ct. 791, and the provisions of Sec. 115(f) (1), Internal Revenue Code, 26 U.S.C.A. § 115(f) (1), the preferred stock dividend was not income within the meaning of the Sixteenth Amendment, and accordingly not taxable as in the case of ordinary dividends under Sec. 22(a), Internal Revenue Code, 26 U.S.C.A. § 22(a). Sec. 115(f) (1) provides: "A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution."

The Tax Court held that the issue of whether the stock dividend constituted income to the stockholders should be determined from a consideration of all the facts and circumstances surrounding the issuance of the dividend and not by a consideration limited to the characteristics of the stock declared as a dividend; that each case involving a stock dividend must be decided upon its own facts and circumstances as establishing whether the receipt of a particular kind of stock dividend was in fact taxable; that such a decision did not rest upon matters of form or nomenclature attending a stock dividend distribution but rather upon the real substance of the transaction involved; that disregarding the circumstances and terms of the issue it might be said that as a matter of form the stock dividend constituted one which fell within the Strassburger case, but that considering the real substance of the transaction it was of the opinion that the stock dividend was not in good faith for any bona fide corporate business purpose, and that the attending circumstances and conditions under which it was issued made it the equivalent of a cash dividend distribution out of available earnings, thus constituting ordinary taxable income in the amount of the value of the preferred shares received. The Court also said that the real purpose of the issuance of the preferred shares was concurrently to place them in the hands of others not then stockholders of the Corporation, thereby substantially alter-

ing the common stockholders' pre-existing proportionate interests in the Corporation's net assets and thereby creating an entirely new relationship amongst all the stockholders and the Corporation. One judge concurred in the result without separate opinion; one judge concurred in a separate opinion which did not concur in the reasoning of the majority opinion, and a third judge wrote a dissenting opinion.

In our opinion, the declaration and distribution of the preferred stock dividend, considered by itself, falls clearly within the principles established in Towne v. Eisner, supra, and Eisner v. Macomber, supra, and is controlled by the ruling in the Strassburger case. Accordingly, as a preliminary matter, we do not agree with the Tax Court's statement that the stock dividend is taxable because as a result of the dividend and immediate sale thereafter it substantially altered the common stockholders' pre-existing proportional interests in the Corporation's net assets. The sale to the insurance companies of course resulted in such a change, but the legal effect of the dividend with respect to rights in the corporate assets is determined at the time of its distribution, not by what the stockholders do with it after its receipt. In Helvering v. Griffiths, supra, 318 U.S. 371, at page 394, 63 S.Ct. at page 648, 87 L.Ed. 843, the Court pointed out: "at the latest the time of receipt of the dividend is the critical one for determining taxability." In none of the Supreme Court cases referred to above is it suggested that events subsequent to the distribution have any bearing on whether the stockholder's proportional interest is changed. The fact that events occur in quick succession does not by itself change their legal effect. Biddle Avenue Realty Corp. v. Commissioner, 6 Cir., 94 F.2d 435. It seems clear to us that if taxability exists it is not because of the change in pre-existing proportional interests caused by a later sale, but by reason of the other ground relied upon by the Tax Court, namely, that viewed in all its aspects it was a distribution of cash rather than a distribution of stock. That this is the real basis of the ruling appears from the statement in the opinion that "disregarding the circumstances and terms of the issue, it might be said as a matter of form the stock dividend constituted one which fell within the Sprouse and Strassburger cases. * * * However, * * *, not form but the real substance of the transaction is controlling."

The general principle is well settled that a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits; United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner v. Tower, 327 U.S. 280, 288, 66 S.Ct. 532, 90 L.Ed. 670, and that the taxpayer's motive to avoid taxation will not establish liability if the transaction does not do so without it. United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17, 20; Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, 15, 101 A.L.R. 200, certiorari denied Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456; United States v. Cumberland Public Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 94 L.Ed. 251.

It is equally well settled that this principle does not prevent the Government from going behind the form which the transaction takes and ascertaining the reality and genuineness of the component parts of the transaction in order to determine whether the transaction is really what it purports to be or is merely a formality without substance which for tax purposes can and should be disregarded. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Minnesota Tea Co. v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Bazley v.

Commissioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782; Tennessee, Alabama & G. Ry. Co. v. Commissioner, 6 Cir., 187 F.2d 826.

The question accordingly presented is not whether the overall transaction, admittedly carried out for the purpose of avoiding taxes, actually avoided taxes which would have been incurred if the transaction had taken a different form, but whether the stock dividend was a stock dividend in substance as well as in form.

■ No question is raised about the legality of the declaration of the dividend. Respondent does not contend that proper corporate procedure was not used in creating the preferred stock and in distributing it to the stockholders in the form of a dividend. If the transaction had stopped there we think it is clear that the dividend would not have been taxable in the hands of the stockholders. Strassburger v. Commissioner, supra. Whether the declaration of the dividend was in furtherance of any corporate business purpose or was the result of correct judgment and proper business policy on the part of the management, we believe is immaterial on this phase of the case. The Supreme Court cases in no way suggest that the taxability of a stock dividend depends on the purpose of its issuance or the good or bad judgment of the directors in capitalizing earnings instead of distributing them. The decisions are based squarely upon the proportional interest doctrine. See also Tourtelot v. Commissioner of Internal Revenue, 7 Cir., 189 F.2d 167; Wiegand v. Commissioner of Internal Revenue, 3 Cir., 194 F.2d 479. In Dreyfuss v. Manning, D.C.N.J., 44 F.Supp. 383, a stock dividend of preferred stock, declared solely for the purpose of avoiding taxes on undistributed net income, was held non-taxable, which ruling apparently was not appealed by the Commissioner. The presence or absence of a corporate business purpose may play a part in determining whether a stock dividend is a bona fide one, one in substance as well as in form, but it does not by itself change an otherwise valid dividend into an invalid one. A stock dividend, legally created and distributed, which is a dividend in substance as well as in form, does not change from a non-taxable dividend into a taxable one because of the purpose of its issuance or on account of the good or bad judgment of the directors in declaring it. Eisner v. Macomber, supra, 252 U.S. at page 211, 40 S.Ct. at page 194.

Nor is there any question about the genuineness and unconditional character of the sale of the preferred stock by the stockholders who received it to the two insurance companies. The facts show conclusively that title passed irrevocably from the stockholders to the insurance companies, and that the sellers received in cash without restriction a full consideration, the adequacy of which respondent does not question. But respondent contends that the sale of the stock following immediately upon its receipt resulted in the stockholder acquiring cash instead of stock, thus making it a taxable dividend under Secs. 22(a) and 115(a), Internal Revenue Code. There are two answers to this contention.

■ A non-taxable stock dividend does not become a taxable cash dividend upon its sale by the recipient. On the contrary, it is a sale of a capital asset. Eisner v. Macomber, 252 U.S. 189, 212, 40 S.Ct. 189; Miles v. Safe Deposit & Trust Co., 259 U.S. 247, 42 S.Ct. 483, 66 L.Ed. 923. The rulings in those cases make it clear that its character as a capital asset is in no way dependent upon how long it is held by the taxpayer before its sale. In none of the Supreme Court cases referred to above, dealing with the taxability of stock dividends, was the length of the holding period considered as a factor. Obviously, if the non-taxability of a stock dividend rests solely upon the principle that it does not alter the pre-existing proportionate interest of any stockholder or increase the intrinsic value of his holdings, the disposition of the stock dividend by the

**470**

stockholder thereafter is not a factor in the determination. See also: Insull v. Commissioner, 7 Cir., 87 F.2d 648; Silas H. Burnham, 29 B.T.A. 605.

The foregoing conclusion is supported by Sec. 117(h) (5), Internal Revenue Code, 26 U.S.C.A. § 117(h) (5), which provides that for the purpose of determining whether a non-taxable stock dividend which has been sold is a long-term capital gain there shall be included in the holding period the period for which the taxpayer held the stock in the distributing corporation prior to the receipt of the stock dividend. This necessarily recognizes that a stock dividend will often be sold before the expiration of six months after its receipt, and makes no distinction between a stock dividend held one day or for any other period less than six months. Likewise, Sec. 29.113(a) (19)–1, Treasury Regulations III, in establishing the cost basis of a non-taxable stock dividend which has been sold for a gain or loss, makes no distinction between a stock dividend sold immediately after receipt and one held a long period of time before sale.

The other answer to the contention is that although the stockholder *acquired* money in the final analysis, he did not *receive* either money or property *from* the corporation. Sec. 115(a), Internal Revenue Code, in dealing with taxable dividends, defines a dividend as "any distribution *made by a corporation* to its shareholders, whether in money or in other property * * * out of its earnings or profits * * *." (Emphasis added.) The money he received was received from the insurance companies. It was not a "distribution" by the corporation declaring the dividend, as required by the statute.

We come then to what in our opinion is the dominant and decisive issue in the case, namely, whether the stock dividend, which, by reason of its redemption feature, enabled the Corporation to ultimately distribute its earnings to its stockholders on a taxable basis materially lower than would have been the case

by declaring and paying the usual cash dividend, was a bona fide one, one in substance as well as in form. As pointed out in Chisholm v. Commissioner, supra, 2 Cir., 79 F.2d 14, 15, certiorari denied Helvering v. Chisholm, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456, the Court cannot ignore the legal effect of a bona fide transaction on the ground that it avoids taxes, and that "The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In such cases the transaction as a whole is different from its appearance." But if the transaction is actually what it purports to be it must be accepted for its legal results. There are numerous cases, some of which are pressed upon us by the respondent, where the Court, in keeping with the above principle, refused to give effect taxwise to transactions on the part of corporations because the facts and circumstances showed that the so-called corporation was one in form only, incorporated for the sole purpose of avoiding taxes and having no legitimate business purpose, masquerading under the corporate form, and accordingly not a bona fide corporation. See Gregory v. Helvering, supra, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Higgins v. Smith, supra, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. In other cases a valid conveyance has been disregarded taxwise because the purchaser acquired no real interest in the property conveyed, was a mere conduit in passing title to another, and the conveyance was in fact a sham. See Minnesota Tea Co. v. (Helvering) Commissioner, supra, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Griffiths v. (Helvering) Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981. In the recent case of Bazley v. Commissioner, supra, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, the Court disregarded a so-called recap-

italization of a corporation which would have resulted in a tax exempt distribution of its securities because the recapitalization was merely a formal paper recapitalization rather than a bona fide one contemplated by the statute. Likewise in Commissioner v. Tower, supra, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, the Court disregarded a partnership tax-wise because it was a partnership merely in form and not in substance.

In our opinion, the stock dividend in this case does not fall within any of the principles discussed above. It seems clear that it was an issue of stock in substance as well as in form. According to its terms, and in the absence of a finding that it was immediately or shortly thereafter redeemed at a premium, we assume that a large portion of it has remained outstanding over a period of years with some of it still unredeemed after nearly seven years. It has been in the hands of the investing public, free of any control by the corporation over its owners, whose enforceable rights with respect to operations of the corporation would not be waived or neglected. Substantial sums have been paid in dividends. The insurance companies bought it in the regular course of their business and have held it as approved investments. For the Court to now tell them that they have been holding a sham issue of stock would be most startling and disturbing news.

It also seems clear that the insurance companies were not purchasers in form only without acquiring any real interest in the property conveyed. The character of the transaction as a bona fide investment on the part of the insurance companies is not challenged by the respondent. The element of a formal conduit without any business interest is entirely lacking.

If the transaction lacks the good faith necessary to avoid the assessment it must be because of the redemption feature of the stock, which, in the final analysis, is what ultimately permitted the distribution of the corporate earnings and is the key factor in the overall transaction. Redemption features are well known and often used in corporate financing. If the one in question was a reasonable one, not violative of the general principles of bona fide corporate financing, and acceptable to experienced bona fide investors familiar with investment fundamentals and the opportunities afforded by the investment market we fail to see how a court can properly classify the issue, by reason of the redemption feature, as lacking in good faith or as not being what it purports to be. The insurance companies, conservative, experienced investors, analyzed the stock issue very carefully, provisions were required to make it conform to sound investment requirements, and each of the two companies, acting independently of the other, purchased a very substantial amount in the regular course of their investment purchases. If the redemption feature was unreasonable or not in accord with generally accepted investment principles the stock would not have been approved as an investment and purchased by the two insurance companies. In our opinion, the redemption feature, qualified as it was with respect to premiums, amounts subject to redemption in each year, and the length of time the stock would be outstanding, together with the acceptance of the stock as an investment issue, did not destroy the bona fide quality of the issue. We cannot say that the preferred stock was not in fact what it purported to be, namely, an issue of stock in substance as well as in form. Chisholm v. Commissioner, supra.

Each case necessarily depends upon its own facts. The facts in this case show tax avoidance, and it is so conceded by petitioner. But they also show a series of legal transactions, no one of which is fictitious or so lacking in substance as to be anything different from what it purports to be. Unless we are to adopt the broad policy of holding taxable any series of transactions, the pur-

pose and result of which is the avoidance of taxes which would otherwise accrue if handled in a different way, regardless of the legality and realities of the component parts, the tax assessed by the Commissioner was successfully avoided in the present case. We do not construe the controlling decisions as having adopted that view. United States v. Isham, supra, 17 Wall. at page 506; Gregory v. Helvering, supra, 293 U.S. at page 469, 55 S.Ct. at page 267; Commissioner v. Tower, supra, 327 U.S. at page 288, 66 S.Ct. at page 536; United States v. Cumberland Public Service Co., supra, 338 U.S. at page 455, 70 S. Ct. at page 282; United States v. Cummins Distilleries Corp., supra, 6 Cir., 166 F.2d at page 20. See Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659; Lawton v. Commissioner, 6 Cir., 164 F. 2d 380, 385; Miller v. Commissioner, 6 Cir., 183 F.2d 246.

In deciding this case it must be kept in mind that it does not involve a ruling that the profit derived from the sale of the stock dividend is or is not taxable income. Such profit is conceded to be taxable. The issue is whether it is taxable as income from a cash dividend or as income resulting from a long-term capital gain. Accordingly, it is not the usual case of total tax avoidance. Congress has adopted the policy of taxing long-term capital gains differently from ordinary income. By Sec. 115(g), Internal Revenue Code, it has specifically excluded certain transactions with respect to stock dividends from the classification of a capital gain. The present transaction is not within the exclusion. If the profit from a transaction like the one here involved is to be taxed at the same rate as ordinary income, it should be done by appropriate legislation, not court decision.

The judgment is reversed and the case remanded to the Tax Court for proceedings consistent with the views expressed herein.