Ralph C. PRICE

v.

The UNITED STATES,

Martha Garner Price, Third Party Defendant.

No. 597–53.

United States Court of Claims.

July 12, 1956.

Stanley Worth, Washington, D. C., for plaintiff. Edward S. Smith, Washington, D. C., and Mr. D. Newton Farnell, Jr., Greensboro, N. C., were on the briefs.

Jerome Fink, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Andrew D. Sharpe and Theodore D. Peyser, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is a suit to recover an alleged overpayment of Federal income taxes and interest for the calendar years 1945, 1946, and 1947. The sole issue is whether part of the income of the King Cotton Hotel partnership should be taxed to plaintiff, as the defendant contends, or to the plaintiff's wife, as the plaintiff contends. The plaintiff's wife was made a third party defendant because if the court decides that plaintiff is entitled to recover she will be required to repay the taxes refunded to her by the Commissioner as a result of his action of taxing the income to plaintiff.

The facts as found by the commissioner of this court may be summarized as follows: The plaintiff and his sister were the only children and heirs of the late Julian Price, who died in October 1946, leaving an estate worth between 3 and 4 million dollars. Mr. Julian Price was president of the Jefferson Standard Life Insurance Company from 1919 until January 1946 when he became chairman of the board and plaintiff became president. The plaintiff had been executive vice president for some time theretofore.

At the time of her marriage to plaintiff in 1937, Mrs. Price had no substantial wealth of her own. In 1943 her gross income was just over $4,350, practically all of which was dividend income from stock given to her by her husband or her father-in-law.

Sometime during the 1930's plaintiff acquired 51 of the 100 shares of the voting common stock of a North Carolina corporation named the Cotton States Hotel Company, which owned the physical plant and operated the business of the King Cotton Hotel in Greensboro, North Carolina. Forty-seven shares were owned by another family. The corporation also had outstanding $125,000 in nonvoting preferred stock. During the early part of 1937 the corporation employed as manager of the hotel Mr. Haywood Duke, a young hotel executive whose work in another town had made a favorable impression upon the Prices. The assistant manager, employed at the same time, was Mr. Harold Colvert, who had served the King Cotton Hotel in other capacities.

During World War II installations of the armed services were located in or near Greensboro. The camps gave a fillip to the local hotel business. The year 1943 was the most profitable year, up to that time, in the history of the Cotton States Hotel Company. Its gross profits for that year were, in round numbers $179,000, and its net income was $88,000. Although Mr. Duke held only one qualifying share in the corporation, he prospered with the hotel in 1943. He had been employed on the basis of a fixed salary of $4,500 plus a percentage of the profits. His compensation from the position for 1943 was in excess of $21,000.

In June 1943, a proposal was placed before a meeting of the stockholders of the corporation for the lease of the physical plant by the corporation to a partnership to be composed of Mr. Duke and plaintiff, the hotel business to be operated by the partnership. The proposal was rejected. Toward the end of 1943, or early in 1944, while the outlook for the business of King Cotton continued favorable, Mr. Duke, with the assistance of Mr. Julian Price, borrowed money with which to purchase the 47 shares of the voting stock mentioned above. The security which Mr. Duke gave for the loan absorbed all of his available credit. The stock purchase was consummated before February 1, 1944. After the purchase by Mr. Duke, he held 47 shares of the voting stock in the corporation, while plaintiff continued to hold 51 shares. The remaining shares were held by other individuals.

Mr. Duke discussed with the corporation's tax consultant the feasibility of transferring the operations of the hotel to a partnership. Thereafter Mr. Duke's partnership proposal was discussed by Mr. Duke, Mr. Julian Price, plaintiff, and his wife. On February 1, 1944, an agreement was signed by Mr. Duke, Mrs. Price, and Mr. Colvert, forming a partnership under the firm name of King Cotton Hotel. On the same day, Cotton States Hotel Company leased the hotel building to the partnership for a term of 20 years at a rental of $5,000 per month. All of the hotel's furnishings, fixtures, equipment, and inventories were included in the lease, and the lessees agreed to make and pay for all repairs and replacements necessary to maintain the building, equipment, and furnishings "in substantially their present condition," reasonable wear and tear, and loss by fire or other casualty excepted. The lessor undertook the fire insurance, while the lessees agreed to obtain and pay for public liability insurance in such amounts as the lessor should from time to time deter-

mine. The lease contained the following clause:

"It is understood and agreed that inasmuch as the Lessees are not required to post a good and sufficient bond guaranteeing full performance on the part of said Lessees, the Lessor, at its option, may, with or without cause, and in its absolute discretion, terminate this lease at any time upon giving sixty (60) days' written notice to the Lessees."

The partnership agreement, which is set forth in full in finding 10, is of the usual general partnership type. It stated, *inter alia,* that the operating capital of the partnership that had been contributed by partners was $1,425 by Haywood Duke, $1,425 by Martha Garner Price, and $150 by Harold Colvert. It also provided that the duties and salaries of the partners could at any time be changed by unanimous consent, and that all matters of importance should be approved by all the partners. It provided that Haywood Duke should give the business his entire time and attention as general manager of the business and was to receive the monthly salary of $500. It provided that Harold Colvert should give the business his entire time and attention as assistant manager and should receive a monthly salary of $250. It also provided that the profits and losses of the partnership should be shared 47½ percent by Haywood Duke, 47½ percent by Martha Garner Price, and 5 percent by Harold Colvert.

Each of the partners paid into the partnership fund the sum listed in the agreement, and operation of the hotel by the partnership was begun on February 1, 1944. The operation continued, under the terms of the partnership agreement and under the lease from the corporate owner, until June 1, 1949.

Mr. Duke was intent upon gaining and holding recognition of the King Cotton as the leading hotel in Greensboro. Mrs. Price supported Mr. Duke in this endeavor, before as well as after the formation of the partnership. After the partnership agreement her activities in this respect were more sustained and direct. Her judgment and tastes were then consulted and reflected in the selection of furnishings and interior decorations. She brought the hotel's facilities to the attention of various local groups and organizations interested in such facilities for meetings, luncheons, cocktail parties, and dances.

Mr. Duke was primarily responsible for all decisions of a strictly business nature. His partners, Mrs. Price and Mr. Colvert, had complete confidence in his judgment on such matters, and left to him all decisions, except those concerning major expenditures. The partners jointly conferred and decided on such items as a contract of elevators, amounting to approximately $50,000, a boiler installation at a cost of approximately $30,000, and substantial purchases, actual and proposed, of furniture. While the partners did not meet regularly or on any fixed schedule, they did assemble once or twice a month, and the provision in their agreement that "all matters of importance shall be approved by all of the partners" was fully observed.

The partnership prospered and Mrs. Price received as her share of the net income $60,055.42 for 1945; $77,532.44 for 1946, and $79,676.36 for 1947.

Prior to the formation of the partnership Mrs. Price received $500 a month allowance from plaintiff, which she spent for household expenses. The balance of the household expenses were paid by plaintiff. Subsequent to the formation of the partnership the allowance was discontinued and Mrs. Price spent considerable sums for household expenses including direct obligations of plaintiff. She invested some of her earnings and disbursed some to plaintiff. During this period plaintiff reported as net income and paid taxes on $135,456.54 for 1945; $60,989.70 for 1946, and $108,302.72 for 1947.

Mr. Julian Price died in 1946 and plaintiff and his sister inherited, *inter alia,* his home valued at $75,000. Plaintiff purchased his sister's undivided one-half interest for $37,500 and on Janu-

ary 2, 1947, conveyed it to himself and his wife as tenants by the entireties.

In December 1948 an internal revenue agent began an audit of plaintiff's income tax returns for the years 1945, 1946, and 1947. The same agent examined the returns made by the King Cotton Hotel partnership for its fiscal years ending January 31, 1945, 1946, and 1947, and then examined Mrs. Price's returns for the calendar years 1945, 1946, and 1947. On January 6, 1949, the agent orally informed plaintiff of his intention to recommend that plaintiff be taxed with the partnership income reported by Mrs. Price because of the use of this income for family and other expenses normally paid by the husband.

After the above discussion, Mrs. Price examined her check stubs and listed certain payments as shown thereon during the period extending from March 1, 1944, through January 31, 1949. This list was given her accountant and he wrote a letter to plaintiff's attorney which pointed out that Mrs. Price had paid certain expenses for plaintiff and had loaned him certain sums. It also stated that Mrs. Price had acquired a one-half interest in the home of Mr. Julian Price at a price of $37,500. It concluded with the suggestion that a note, bearing interest, should be given for the net amount, $76,-539.24. A note was given for $76,539.24, bearing interest at the rate of 4½ per cent per annum, on February 14, 1949. This note was subsequently paid with interest.

Negotiations were completed during May 1949 for the transfer of the King Cotton Hotel to the Alsonett hotel chain. Alsonett made offers to the members of the partnership and to the stockholders of Cotton States Hotel Company. The written offer to Mrs. Price of $100,000 for her interest in the partnership, which she accepted, was dated May 17, 1949. On May 9, 1949, at the instance of Alsonett, the lease from Cotton States Hotel Company to the partnership was amended to eliminate the termination clause, increase the rent, and reduce the term. The sale was consummated on or about June 1,

1949. After the sale, Mr. Duke remained with the King Cotton Hotel as manager. The partnership was formally dissolved on July 15, 1952.

The Commissioner assessed deficiencies against plaintiff in the total sum of $175,-098.60, with interest of $24,307.33, based upon taxing to plaintiff the partnership income reported by Mrs. Price. The plaintiff paid these sums, filed claims for refund which were rejected, and timely instituted this suit. The Commissioner refunded to Mrs. Price taxes and interest for these years in the total amount of $141,812.03.

The plaintiff contends that the facts show that Mrs. Price was the member of the valid partnership and that plaintiff was not and never intended to be a member of the partnership. The defendant contends that the whole transaction was a tax sham and should be ignored for tax purposes.

■ The defendant bases a large part of its argument on the thought that this whole transaction was done for the purpose of avoiding or minimizing taxes. This argument is without significance because it is well settled that taxpayers have the legal right to decrease the amount of what otherwise would be their taxes, or altogether avoid them, by means which the law permits. The taxpayer is not required to carry out its transactions in a way that will produce the most tax for the Government. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; Chamberlin v. Commissioner, 6 Cir., 207 F.2d 462, 468; Zenz v. Quinlivan, 6 Cir., 213 F.2d 914, 916; The Coca-Cola Co. v. United States, 47 F.Supp. 109, 97 Ct.Cl. 241, 261.

■ It is, of course, true that transactions between or involving members of a family are subject to close scrutiny. This means that such transactions must be fair and reasonable judged by the standard of transactions entered into by

parties dealing at arm's length, and must be based upon substance as opposed to mere form. See the cases cited in Ingle Coal Corporation v. United States, 127 F.Supp. 573, 131 Ct.Cl. 121, certiorari denied 350 U.S. 842, 76 S.Ct. 82.

■ The change of operation of a hotel from a corporation to a partnership would ordinarily be considered more than a mere formality because the partners become subject to personal liability and all the other attributes of a partnership. Also the evidence in this case fails to show that the rent charged the partnership was unfair or unreasonable. However, the lease in this case contained a termination clause that gave the corporation and plaintiff complete control over the hotel. The termination clause expressly gave the corporation the absolute discretion to terminate the lease without cause upon the giving of 60 days' notice.

The plaintiff owned 51 percent of the voting stock of the corporation and therefore controlled the corporation. Through his control of the corporation, plaintiff, because of this termination clause, had complete economic control over the hotel, the income producing property. Before the hotel was leased to the partnership plaintiff's undistributed share in the profits from the hotel, after the payment of preferred dividends, was 51 percent and Mr. Duke's was 47 percent. After the hotel was leased, Mrs. Price received 47½ percent of the profits of the hotel. Thus Mr. Duke's position remained substantially unchanged and plaintiff retained control over the property and Mrs. Price received substantially the same income that plaintiff would have received had he been the partner.

We believe that the Commissioner properly taxed the income received by Mrs. Price under such circumstances to plaintiff because of this termination clause on the ground that the transaction insofar as plaintiff was concerned lacked substance and was a tax sham. See Ingle Coal Corporation v. United States, supra, and the cases cited therein. The taxes are also sustainable on the ground that plaintiff anticipatorily assigned his right to a portion of the income from the hotel. Helvering v. Horst, 311 U.S. 112, 61 S. Ct. 144, 85 L.Ed. 75; Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055; Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898.

The plaintiff's petition and the third party complaint are dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, Judge, concur.

WHITAKER and LITTLETON, Judges, dissent.

George R. BIRKELUND, Charles E. Siddall, of Chicago, Illinois, and Kenyon T. Fay, of Los Angeles, California, Trustees of the Algoma Lumber Liquidation Trust, Successors in Interest of the Algoma Lumber Company, a Corporation,

v.

The UNITED STATES in a Fiduciary Capacity for the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians and Said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians.

No. 50450.

United States Court of Claims.
June 5, 1956.

