ESMARK, INC. AND AFFILIATED COMPANIES *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 33581-84.          Filed February 2, 1988.

*Frederick W. Hickman, Michael F. Duhl, Michael M. Conway, J. Alexander Meleney, Michael A. Clark, Thomas M. Haderline, Frederick P. Wick, Jr., John C. Klotsche,* and *Marilyn D. Franson,* for the petitioner.

*William E. Bonano* and *Beth L. Williams,* for the respondent.

COHEN, *Judge*: Respondent determined the following deficiencies in petitioner's corporate income tax:

| Tax year ended | Deficiency |
|---|---|
| 10/25/75 | $3,023,566 |
| 10/28/78 | 2,697,565 |
| 10/27/79 | 32,892,249 |
| 10/25/80 | 114,534,187 |

After concessions, the primary issue for decision is whether petitioner must recognize $452,681,864 of long-term capital gain as a result of Mobil Oil Corp.'s 1980 acquisition of one of petitioner's subsidiaries. If that issue is decided against petitioner, we must also decide whether the equal protection clause of the United States Constitution requires application of sec. 633(f) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2281, to the transaction before us.

## FINDINGS OF FACT

Many of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Esmark, Inc., and affiliated companies (petitioner) had its principal offices in Chicago, Illinois, when its petition was filed.

### The Esmark Exchange

Petitioner was a Delaware corporation organized as a holding company, which directly or indirectly held a number of operating subsidiaries. The various businesses carried on by petitioner's subsidiaries were divided into five broad segments or categories consisting of: (1) Foods; (2) chemicals and industrial products; (3) energy; (4) personal products; and (5) high fidelity and automotive products.

The food segment consisted of Swift & Co. (Swift) and related subsidiaries that engaged in packing fresh meats and the manufacture and sale of processed foods. Swift represented petitioner's most longstanding business and was the business for which petitioner was most widely known.

The energy segment consisted of Vickers, a holding company, and its three principal operating subsidiaries: Vickers Petroleum Corp. (VPC), Doric Petroleum, Inc. (Doric), and TransOcean Oil, Inc. (TransOcean). Vickers owned all of the issued and outstanding stock of VPC and

TransOcean. VPC, in turn, owned all of the issued and outstanding stock of Doric until September 18, 1980, when the Doric stock was transferred to Vickers.

During the latter part of 1979 and the early part of 1980 petitioner experienced a serious liquidity problem. This problem was primarily the result of (i) the sharp rise in crude oil prices during the 1979 "energy crisis" that greatly increased VPC's inventory costs, (ii) the continued poor performance of Swift, (iii) record high short-term interest rates that increased the cost of inventory and other short-term financing, and (iv) an agreement to purchase the assets of Tridan Corp. for $45 million.

Petitioner's management also believed that petitioner's stock was undervalued. Petitioner's common stock was publicly traded on the New York stock exchange with a trading range of between $23.75 and $35.50 per share during the 12 months prior to April 24, 1980. By early 1980, petitioner's management had determined that petitioner's stock price did not reflect the underlying or "breakup" value of the company's separate assets, as such value was calculated by investment bankers to be $55 to $71 per share, more than twice the $25.50-per-share closing price of petitioner's common stock on April 24, 1980. The market value of petitioner's energy assets, in particular, had appreciated greatly during the period in question.

Petitioner's management attributed the failure of petitioner's stock price to reflect the underlying value of its assets to the public market's perception of petitioner as primarily a food company dominated by Swift, a company that had been a poor financial performer for several years. Petitioner's management believed that the disparity or "spread" between the trading value of petitioner's stock and the underlying value of its assets made the company an attractive target for a takeover at a price that was less than could be realized for the shareholders if petitioner was "broken up."

As an initial response to petitioner's financial problems, Donald P. Kelly, petitioner's president and chief executive officer (Kelly), informally proposed to petitioner's board of directors at its April 24, 1980, meeting that petitioner borrow $300 million by issuing to a foreign investor

subordinated debentures that would be convertible into petitioner's common stock. A portion of the proceeds were to be used to acquire petitioner's shares through a tender offer. Petitioner's board of directors responded unfavorably to Kelly's proposal but asked management to pursue various restructuring alternatives, including a sale of the energy segment.

At the May 1980 board of directors meeting, Kelly presented a restructuring plan which included a reorganization of Swift and a sale of the energy segment to be followed by a self-tender for 50 percent of petitioner's outstanding shares. The board responded favorably to this plan and instructed Kelly to develop more definite proposals for the June 1980 meeting.

At its next meeting on June 26, 1980, the board formally approved proceeding with the restructuring program outlined by Kelly in May. The program included the following elements: (1) The closing of certain units of Swift's fresh meats division and the disposition of the remaining fresh meats units, (2) the disposition of certain of petitioner's minor businesses, (3) the disposition of all of the energy segment, and (4) the redemption by petitioner of approximately 50 percent of its stock if the energy segment were sold for cash.

Each plan for the restructuring of petitioner which included a disposition of the energy segment also included a contraction of petitioner's capital structure by a major redemption of petitioner's shares because (1) the energy segment was a very large segment of petitioner's ongoing business with very heavy capital requirements, and its disposition would substantially reduce its need for working and investment capital; (2) an accompanying redemption of shares was necessary to avoid making petitioner a "sitting duck" for an outside acquirer who could deprive petitioner's shareholders of existing value; and (3) it would permit its shareholders, especially those who had invested in petitioner because of its energy assets, to redeem or sell their stock at the value of the underlying assets.

Shortly after the June meeting and prior to any solicitation of bids for the energy segment, petitioner's management, in consultation with its tax and financial advisers,

began to analyze the various forms of transactions that would accomplish petitioner's dual goals of disposing of its energy segment and redeeming 50 percent of its outstanding stock. One of the options it considered was the "tender offer/redemption" format ultimately used. Such a format had been used and reported in the press in a public transaction several months earlier involving a subsidiary of I.U. International. Under such a tender offer/redemption format, a third party would acquire petitioner's stock in a public tender offer, and petitioner would distribute the stock of Vickers in redemption of the tendered shares.

In consultation with its investment bankers, petitioner decided to open data rooms containing confidential information about the energy segment for prospective bidders who would submit bids during a prescribed time period. This process was designed to uncover the highest values that prospective purchasers would assign to the energy property. Petitioner would then negotiate an agreement that would result in the highest net value for its shareholders.

In early July, petitioner's investment bankers distributed certain documents to prospective bidders, including (1) a copy of the I.U. International prospectus (describing a tender offer/redemption transaction), and (2) the "Qualification and Bidding Terms." The Qualification and Bidding Terms stated that Esmark was not then expressing a preference as to the form of consideration that would be acceptable; however, any bid proposing noncash consideration was required to set forth the bidder's valuation of that consideration and the basis on which it was valued. Bidders were warned that bids not susceptible of clear valuation immediately would be disadvantaged. Petitioner expressed a preference that the bids state a clear market value because that would permit petitioner to assess the relative value of the submitted bids.

During July, petitioner conveyed to prospective bidders, through its investment bankers, its preference to exchange the stock of Vickers (the only asset of which would be the stock of TransOcean) for petitioner's own stock through a tender offer/redemption format. This preference was also personally conveyed by Kelly to various bidders, including Mobil Oil Corp. (Mobil).

Petitioner's management pursued the tender offer/redemption format primarily because it was believed to result in no recognition of taxable income to petitioner and would, therefore, provide the shareholders with the highest end value for their Esmark stock. Additional anticipated advantages of the tender offer/redemption format were that (i) it would minimize the likelihood of an outside tender offer at an inadequate price because no cash would be held by petitioner at any time, and (ii) petitioner's obligation for establishing the fairness of the offer and the consequent exposure to subsequent lawsuits was greatly reduced by having a third-party tender, as opposed to a self-tender for petitioner's shares. Management was sensitive to the second consideration because protracted shareholder litigation resulting from petitioner's 1974 tender offer for TransOcean had recently concluded. The expected tax benefits were, however, the most important reason for selection of the tender offer/redemption format.

Mobil was willing to accommodate petitioner's tax planning by agreeing to the tender offer/redemption if Mobil received assurances that the tender offer format would not cost Mobil any more than its bid and would not expose Mobil to additional liabilities or costs. On August 20, 1980, just before the 6 p.m. deadline for bids, Mobil executives in New York submitted a bid for TransOcean, which by its terms incorporated a draft agreement providing that Mobil would, at petitioner's option, employ the tender offer/ redemption format. It was Mobil's understanding, prior to the delivery of this bid, that the form of the transaction would be the tender offer/redemption format.

In addition to the Mobil bid, six of the seven other bids submitted for TransOcean expressed the willingness of the bidder to structure the transaction in the manner desired by petitioner, with several including specific references to the use of the tender offer/redemption format.

Under the bidding procedure designed by petitioner and its investment bankers, the bid was not an offer and the designation of the highest bid was not an acceptance, as there were other material items to be dealt with before agreement could be reached. Designation of the highest bidder merely entitled Mobil to enter into final negotiations.

Accordingly, even after petitioner notified Mobil that it was the successful bidder and Mobil had arranged to go to Chicago the next day to conclude an agreement, petitioner instructed its investment bankers not to communicate to other bidders about the status of their bids.

At the time Mobil was designated the successful bidder, Mobil and petitioner had agreed on the tender offer/redemption format and on other items. However, other material terms remained unresolved. On the next day, August 21, Mobil and petitioner negotiated (i) a $10-million increase in Mobil's bid price and (ii) a reduction by petitioner in its override interest in certain TransOcean properties.

On August 21, 1980, petitioner and Mobil entered into a written agreement (the exchange agreement), which was ultimately performed. Mobil and petitioner both recognized that there was no binding contract between the parties until the exchange agreement was signed.

Petitioner would not have agreed to enter into the exchange agreement with Mobil unless Mobil agreed to do the tender offer provided for in the exchange agreement. If Mobil had not agreed to the tender offer/redemption format, petitioner would have determined that Allied Chemical Corp., which had agreed to this format, was the highest bidder, and would have entered into negotiations with it for an agreement.

Throughout the bidding process, petitioner did not rule out the possibility of a cash sale if that would produce the highest net value for petitioner's stockholders. However, it was recognized that a cash sale had both tax and tender offer disadvantages, and, in fact, petitioner never agreed to, or even entered into negotiations for, a disposition of TransOcean for cash. Rather, the only agreement ever negotiated or entered into by petitioner was the agreement with Mobil that provided for the tender offer/redemption transaction.

In the exchange agreement, Mobil agreed to make a best-efforts tender offer for 11,918,333 shares of petitioner's publicly held common stock at a price of $60 per share, and petitioner agreed to redeem that stock in exchange for 975 shares (97.5 percent) of stock of Vickers (the only asset of which would be the stock of TransOcean) at an exchange

rate of 12,224 of petitioner's shares for one Vickers share. In the event that Mobil was unable to acquire enough of petitioner's shares to effect an exchange for 975 Vickers shares, Mobil had an option to purchase (but petitioner did not have the right to require Mobil to purchase) for cash the balance of the 975 Vickers shares at a price of $733,435.90 per share.

On August 28, 1980, petitioner's board of directors ratified the execution and delivery of the exchange agreement. On September 2, 1980, pursuant to the exchange agreement, Mobil made a tender offer to purchase up to 11,918,333 shares of petitioner's stock held by the public for $60 per share. The 11,918,333 shares represented approximately 54.1 percent of the petitioner's shares outstanding on July 26, 1980. During the 2 weeks following the execution of the exchange agreement, petitioner entered into agreements with other companies to sell Doric and VPC. The cash received by petitioner from the sales of VPC and Doric totaled nearly $400 million (including working capital adjustments estimated to be in excess of $120 million).

Petitioner deferred declaration of the quarterly dividend normally paid on October 1, 1980, to October 20, 1980. Deferral of petitioner's dividend prevented tendering shareholders who held shares on the previously anticipated record date from receiving a dividend. Only those shareholders who did not tender their shares to Mobil, and who held their shares on the deferred record date, received the dividend. Under no circumstances would Mobil, which completed its tender offer on October 3, have received the dividend.

On October 3, 1980, Mobil, through its wholly-owned subsidiary-assignee Mobil-TransOcean, Inc. (MTO) completed its tender offer and acquired 11,918,333 shares of petitioner's stock. The transfers by the tendering shareholders were duly recorded on petitioner's stock transfer records and a stock certificate for such shares was issued to MTO. Later on the same day, pursuant to the exchange agreement, petitioner redeemed the 11,918,333 shares of its stock acquired by MTO in exchange for 975 shares (i.e., 97.5 percent) of the stock of Vickers.

In acquiring its Esmark stock, Mobil and its assignee MTO dealt directly with petitioner's public shareholders, each of whom decided independently whether or not to tender his Esmark shares. Petitioner never directly received any of the money paid by Mobil in its acquisition of petitioner's stock, nor did petitioner pay any money to petitioner's public shareholders. In Mobil's tender offer, each of petitioner's shareholders was individually solicited and independently determined whether or not to sell his stock. Petitioner made no recommendation to its shareholders as to whether or not its shareholders should tender their stock to Mobil.

Also on October 3, 1980, pursuant to incidental provisions of the exchange agreement, petitioner transferred the remaining 25 shares (i.e., 2.5 percent) of the stock of Vickers to MTO in exchange for a 10-percent net profits royalty interest in certain nonproducing TransOcean properties, and executed the "Adjustment Agreement," providing for payments to reflect changes in TransOcean's working capital between April 30, 1980, and the closing. On December 22, 1982, Esmark released its rights to the net profits royalty interest for $25,000.

The tender offer/redemption radically contracted petitioner's capital structure and operations. On October 27, 1979, prior to the Mobil-Esmark transaction, petitioner had 20,311,000 shares of common stock outstanding held by approximately 48,000 shareholders. After the Mobil-Esmark transaction, and the sales of Doric and VPC, petitioner had 10,083,000 common shares outstanding, held by about 33,900 shareholders, and no energy business. The tender offer/redemption reduced petitioner's outstanding stock by approximately 54 percent.

### The Brunswick Exchange

On January 26, 1982, Whittaker Corp. (Whittaker) commenced a tender offer as part of a plan to acquire all the common stock of Brunswick Corp. (Brunswick). The offer was amended on February 10, 1982, to a price of $27 per Brunswick share and $1,257.57 per $1,000 amount of Brunswick debentures which were convertible into Brunswick common stock.

Brunswick's management opposed the Whittaker offer because, among other things, it believed that the aggregate price offered by Whittaker was inadequate and did not reflect the value of Brunswick's underlying assets.

Upon its determination that the Whittaker offer was not in the best interests of Brunswick or its shareholders, Brunswick's board of directors began to explore various possibilities to give its shareholders an alternative to the Whittaker offer and directed its investment bankers to explore those alternatives.

Brunswick's investment bankers solicited proposals for the acquisition of Brunswick's subsidiary, Sherwood Medical Industries, Inc. (Sherwood), and obtained at least two offers to acquire the stock of Sherwood. Those offers included (i) an offer by American Home Products Corp. (AHP) for $450 million cash and (ii) an offer from another bidder for $450 million cash. AHP also agreed to structure the acquisition in the form of a tender offer for Brunswick shares followed by an exchange of those shares for the stock of Sherwood, but at a reduced rate of $425 million.

On February 11, 1982, Brunswick entered into an agreement with AHP (the Brunswick exchange agreement) providing that AHP would tender for 14,166,666 shares of the stock of Brunswick and that Brunswick and AHP would immediately exchange 13,772,000 of such shares for all the stock of Sherwood (the Brunswick exchange) and the remaining 394,666 of such shares for the stock of nine other subsidiaries of Brunswick.

Pursuant to the Brunswick exchange agreement, on February 16, 1982, AHP (through its subsidiary) commenced a tender offer to purchase up to 14,166,666 shares of Brunswick common stock at $30 per share (the AHP tender offer). Under the Brunswick exchange agreement, AHP would exchange the shares of Brunswick so acquired for the stock of Sherwood at a rate of 1 share of Sherwood for each 13,772 shares of Brunswick. If an insufficient number of Brunswick shares were obtained, AHP had the right to purchase any remaining shares of Sherwood for cash at $413,160 per share, and shares of the other nine subsidiaries at varying prices, for a total price not to exceed $425

million (including the cost of any Brunswick shares acquired).

Pursuant to the Brunswick exchange agreement, a subsidiary of AHP acquired 14,166,666 shares of the common stock of Brunswick on March 9, 1982. Those shares would represent between 54 percent and 64 percent of the voting stock of Brunswick outstanding on February 11, 1982, depending upon the amount of Brunswick's convertible debentures and convertible preferred stock that were converted to common stock and common stock options that were exercised as of that date.

On March 9, 1982, pursuant to the Brunswick exchange agreement, Brunswick distributed all the stock of Sherwood in exchange for 13,772,000 of the shares of Brunswick common stock acquired by the AHP subsidiary.

In section 633(f) of the 1986 Tax Reform Act, Pub. L. 99-514, 100 Stat. 2085, 2281, Congress exempted Brunswick (by description of the transaction and not by name) from the recognition of any corporate-level gain on the distribution of its Sherwood stock in exchange for the Brunswick stock acquired through the AHP tender offer.

OPINION

Respondent determined that petitioner must recognize long-term capital gain of $452,681,864 on the distribution of 97.5 percent of the stock of Vickers Energy Corp. to Mobil Oil Corp., through its wholly owned subsidiary and assignee, Mobil-TransOcean, Inc., in exchange for petitioner's stock.

I. *Background*

In 1935, the Supreme Court decided *General Utilities & Operating Co. v. Helvering,* 296 U.S. 200 (1935). The holding of that opinion allowed a corporation to avoid recognition of gain on the distribution of appreciated property to its shareholders. In 1954, Congress codified the *General Utilities* doctrine in section 311.[1] Section 311(a), (b),

---

[1] All section references are to the Internal Revenue Code as amended and in effect during the years in issue. Sec. 311(a) provides:

SEC. 311(a). GENERAL RULE.— * * * no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of—

and (c) limited the scope of the general rule to cases not involving distributions of installment obligations, LIFO inventory, or property subject to liabilities in excess of basis.

The Tax Reform Act of 1969, Pub. L. 91-172, 84 Stat. 487, amended section 311 by adding a new subsection (d).[2] The new subsection substantially undermined the continued vitality of the *General Utilities* doctrine. As a result of the amendment, corporations no longer enjoyed favorable nonrecognition treatment on most transfers of appreciated property in redemption of stock. This restriction, codified in section 311(d)(1), was subject to its own exceptions and limitations.[3] Section 311(d)(2)(B) made section 311(d)(1) inapplicable if, in certain circumstances, a subsidiary's stock was used to redeem the stock of its parent corporation. A parent corporation could thus redeem its own shares with the appreciated stock of a subsidiary and enjoy the nonrecognition treatment promised by the last vestige of the *General Utilities* doctrine.

The parties agree that petitioner's transaction falls squarely within the literal language of section 311(d)(2)(B). Each requirement of that section has been satisfied. Petitioner consequently argues that it is entitled to the relief

---

\* \* \* \* \* \* \*

(2) property.

[2]Sec. 311(d) provided:

SEC. 31(d). APPRECIATED PROPERTY USED TO REDEEM STOCK.—
    (1) IN GENERAL.—If—
        (A) a corporation distributes property (other than an obligation of such corporation) to a shareholder in a redemption (to which subpart A applies) of part or all of his stock in such corporation, and
        (B) the fair market value of such property exceeds its adjusted basis (in the hands of the distributing corporation),

then a gain shall be recognized to the distributing corporation in an amount equal to such excess as if the property distributed had been sold at the time of the distribution. Subsections (b) and (c) shall not apply to any distribution to which this subsection applies.

[3]Sec. 311(d)(2) provided:

    (2) EXCEPTIONS AND LIMITATIONS.—Paragraph (1) shall not apply to—

        \* \* \* \* \* \* \*

    (B) a distribution of stock or an obligation of a corporation—
        (i) which is engaged in at least one trade or business,
        (ii) which has not received property constituting a substantial part of its assets from the distributing corporation, in a transaction to which section 351 applied or as a contribution to capital, within the 5-year period ending on the date of the distribution, and
        (iii) at least 50 percent in value of the outstanding stock of which is owned by the distributing corporation at any time within the 9-year period ending one year before the date of the distribution.

set forth in section 311(a).[4] If petitioner does not prevail on this issue, it argues that the equal protection clause of the United States Constitution requires application of section 633(f) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2281, which exempted Brunswick from corporate level gain on a transaction similar to the one before us.

Respondent contends that petitioner's transaction falls outside of the letter of section 311(a) and the spirit of section 311(d)(2)(B). Relying on a number of overlapping "substance over form" arguments, respondent recasts petitioner's transaction as a sale of Vickers to Mobil, followed by a redemption of petitioner's stock for cash.

This is a challenging case. We must decide the primary issue under the rule and principles in effect at the time of the transaction despite historical criticism and subsequent abolition of that rule. To do otherwise, would be to undermine tax planning as an essential ingredient of business decision-making (and as an art).

In 1980, section 311(a) continued in effect the *General Utilities* doctrine. Although the doctrine was then subject to limitations, it nevertheless remained a principle of corporate taxation. By strictly complying with the formal requirements of the statute, petitioner made a prima facie showing of its entitlement to the benefits promised by section 311(a). Congress enacted a statute under which tax consequences are dictated by form; to avoid those consequences, respondent must demonstrate that the form chosen by petitioner was a fiction that failed to reflect the substance of the transaction.

## II. *The Arguments*

### *Section 311(a)*

Respondent's first argument is based on a threshold limitation found in the text of section 311(a). To be free of corporate tax, distributions of appreciated property must be "with respect to * * * stock." The legislative history of

---

[4]Petitioner also argues that the transaction was a partial liquidation under sec. 346 and would thus qualify for nonrecognition under sec. 336. The thrust of this argument is that these parallel provisions aid understanding of sec. 311 and support the result of application of sec. 311(a) in this case.

section 311(a) suggests that this phrase must be construed in the context of pre-1954 law.

Subsection (a) of section * * * [311] sets forth the general rule and provides (except for the provisions of subsections (b) and (c)) that no gain or loss shall be recognized to a corporation upon a distribution, with respect to its stock, of its own participating or nonparticipating stock (or of rights to acquire such stock) or upon such a distribution of securities or property. Thus, the fact that the property distributed has appreciated or depreciated in value over its adjusted basis to the distributing corporation will in no way alter the application of subsection (a). Your committee does not intend, through subsection (a), to alter existing law in the case of distribution of property, which has appreciated or depreciated in value, where such distributions are made to persons other than shareholders, or are made to shareholders in a capacity other than that of a shareholder. Thus a distribution of property made to a shareholder in his capacity as a creditor of the distributing corporation is not within the rule of subsection (a). [H. Rept. 1337, A90 83d Cong. 2d Sess. (1954).[5]]

Section 1.311-1(a), Income Tax Regs., refers to section 1.311-1(e) for a description of distributions to which section 311 does not apply.[6] Respondent maintains that the latter regulation restates the "existing law" referred to in the 1954 House and Senate committee reports. Relying on a line of cases generated by two court of appeals decisions, as well as on 1934 regulations carried forward until the 1954 Code, respondent proposes a "facts and circumstances" test under which section 311(a) would generally be inapplicable where, after arm's-length bargaining, a transitory shareholder uses

---

[5]The *report of the Senate Finance Committee contains substantially* identical language. S. Rept. 1622, 83d Cong., 2d Sess. (1954).

[6]Sec. 1.311-1, Income Tax Regs., provides in pertinent part as follows:

(e)(1) Section 311 is limited to distributions which are made by reason of the corporation-stockholder relationship. Section 311 does not apply to transactions between a corporation and a shareholder in his capacity as debtor, creditor, employee, or vendee, where the fact that such debtor, creditor, employee, or vendee is a shareholder is incidental to the transaction. Thus, if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property.

(2) The following examples illustrate the application of subparagraph (1) of this paragraph:

*Example (1).* Corporation A has a claim against Corporation B for damages for loss of profits due to patent infringement. Corporation B satisfies such claim by surrendering shares of the stock of Corporation A to Corporation A. The fair market value of such stock is includible in the gross income of Corporation A.

*Example (2).* Corporation C, a corporation engaged in the manufacture and sale of automobiles, sells an automobile to individual X, and receives in payment therefor shares of the stock of Corporation C. The transaction will be treated in the same manner as if an amount of cash equal to the fair market value of such stock had been received by Corporation C.

stock as a "medium of payment" to acquire corporate property. Respondent argues that this construction of pre-1954 law as "restated" in the regulation is supported by four cases decided under the 1954 Code.

Petitioner contends that respondent's construction of section 1.311-1(e), Income Tax Regs., places unwarranted reliance on pre-1954 law. Petitioner argues that section 311(a) swept away a "mass of contradiction and confusion"; and it asserts that the general rule of nonrecognition is thus subject only to the limited exceptions spelled out in the statute, the legislative history, and the post-1954 regulations. To the extent that pre-1954 law is relevant, petitioner argues, the cases and the 1934 regulation relied on by respondent merely support the current regulation's requirement that shareholder status not be "incidental" to the transaction. Petitioner also contends that the four post-1954 cases cited by respondent provide no support for respondent's proposed test.

Respondent's reliance on pre-1954 law is justified. The drafters of subchapter C did not write on a clean slate; the legislative history of section 311(a) explicitly refers to "existing law." Section 1.311-1(e), Income Tax Regs., accordingly alludes to the law as it existed prior to 1954. *Commissioner v. S.A. Woods Machine Co.*, 57 F.2d 635 (1st Cir. 1932), and *Commissioner v. Boca Ceiga Development Co.*, 66 F.2d 1004 (3d Cir. 1933), the "seminal" cases cited by respondent, are the factual bases of the examples set forth in the regulation. Section 1.311-1(e), Income Tax Regs., also retains the essentials of the analysis described in its 1934 predecessor. The critical language of the 1934 regulation, i.e., "if the corporation receives its own stock as consideration upon the sale of property by it * * * the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property," appears verbatim in regulations section 1.311-1(e). Treas. Reg. 77, art. 66, T.D. 4430 (1934).

Although justified, respondent's reliance on pre-1954 law is largely unavailing. The most that can be said about the multitude of diverse cases cited by the parties is that they tend to support respondent's emphasis on the facts and circumstances surrounding the Esmark transaction. In *S.A.*

*Woods* and *Boca Ceiga,* each court stated that its decision turned upon the "real nature" or "purpose" of the transaction. 57 F.2d at 636; 66 F.2d at 1005. If the transaction's "real nature" or "purpose" were found to be a readjustment of the corporation's capital structure, gain would not be recognized. If the transaction were instead found to be a sale, recognition would be appropriate. Most of the cases cited by either party explicitly or implicitly adopt the approach followed in *S.A. Woods* and *Boca Ceiga.*[7]

Section 1.311-1(e), Income Tax Regs., and its 1934 predecessor also support respondent's focus on the facts and circumstances attendant to the Esmark transaction. Although the more recent regulation does not retain the 1934 regulation's explicit prescription of a facts-and-circumstances analysis, section 1.311-1(e), Income Tax Regs., provides that gain or loss must be recognized if the recipient's shareholder status is "incidental" to the transaction. We must thus examine the factual context to determine whether Mobil's ownership of Esmark shares was "incidental" to petitioner's distribution of the Vickers shares within the meaning of the regulation.

Although we agree that we must examine the facts and circumstances surrounding petitioner's transaction, we do not agree with respondent's suggestion that section 311 may *never* apply where, after arm's-length dealing, a transitory shareholder uses stock as a "medium of payment" to acquire corporate property. Many, if not most, non-pro-rata redemptions are the result of arm's-length bargaining, and neither the statute nor any of the other authorities draws a distinction between "historical" and "transitory" shareholders.[8] Stock is a "medium of payment" in every redemption. None of the authorities cited by

---

[7]See *United States v. Anderson, Clayton & Co.,* 350 U.S. 55 (1955); *Farmers Union Corp. v. Commissioner,* 300 F.2d 197 (9th Cir. 1962); *Hammond Iron Co. v. Commissioner,* 122 F.2d 4 (5th Cir. 1941); *Allyne-Zerk Co. v. Commissioner,* 83 F.2d 525 (6th Cir. 1936); *Dorsey Co. v. Commissioner,* 76 F.2d 339 (5th Cir. 1935); *General Electric Co. v. United States,* 156 Ct. Cl. 617, 299 F.2d 942 (1962); *Union Starch & Refining Co. v. Commissioner,* 31 T.C. 1041 (1959); *Johnson-McReynolds Chevrolet Corp. v. Commissioner,* 27 T.C. 300 (1956); *Country Club Estates, Inc. v. Commissioner,* 22 T.C. 1283 (1954); *Lencard Corp. v. Commissioner,* 47 B.T.A. 58 (1942); *Dill Manufacturing Co. v. Commissioner,* 39 B.T.A. 1023 (1939); *Johnson, Carvel & Murphy v. Riddell,* 173 F. Supp. 214 (S.D. Cal. 1959). But cf. *Walville Lumber Co. v. Commissioner,* 35 F.2d 445 (9th Cir. 1929); *Niagara Share Corp. v. Commissioner,* 30 B.T.A. 668 (1934); *Spear & Co. v. Heiner,* 54 F.2d 134 (W.D. Pa. 1931).

[8]In contrast, sec. 311(d)(1)(A), another exception to sec. 311(d)(1), applies to redemptions of stock held by certain shareholders for at least 12 months.

either party suggest that these characteristics have special significance. In each pre-1954 case cited by the parties, the court avoided invocation of a formulaic test and instead based its decision on the facts before it. The statements of law set forth in these cases are often conflicting and cannot readily be reconciled. In 1954, Congress attempted to settle the issue by enacting section 311(a).

Only four cases decided under the 1954 Code have directly addressed section 1.311-1(e), Income Tax Regs. *Honigman v. Commissioner*, 55 T.C. 1067 (1971), affd. in part and revd. in part 466 F.2d 69 (6th Cir. 1971), and *Bank of America v. United States*, 42 AFTR2d 78-5255, 79-1 USTC par. 9170 (N.D. Cal. 1978), did not involve redemptions of corporate stock. In *Arlington Metal Industries, Inc. v. Commissioner*, 57 T.C. 302 (1971), we reaffirmed *Commissioner v. S.A. Woods, supra,* by holding that receipt of stock in payment of debt is a taxable transaction; and in *Owens Machinery Co. v. Commissioner,* 54 T.C. 877 (1970), we found that the taxpayer's receipt of a substantial amount of cash, as well as stock, in consideration for its property was the hallmark of a sale, not a redemption. Each of these dissimilar cases is highly fact-specific. Not one of them supports respondent's proposed test.

The only "test" to be derived from the cases is a facts-and-circumstances analysis. Here, that test provides practically no guidance. The essential facts of this case are not in dispute. The parties agree that the "real nature" or "purpose" of the transaction was as much to redeem more than 50 percent of petitioner's stock as it was to transfer Vickers to Mobil. Which purpose should be given greater weight? Was Mobil's ownership of petitioner's stock "incidental" to the transaction? If it was, we may disregard it. Reduced to its essentials, the inquiry described in section 1.311-1(e), Income Tax Regs., is thus functionally equivalent to the other substance-over-form arguments advanced by respondent and discussed below.

## Assignment of Income

Respondent next argues that petitioner sold Vickers to Mobil for cash, subject to Mobil's obligation to make payment directly to petitioner's shareholders. According to

respondent, "payment [to the tendering shareholders] was pursuant to the Esmark sale, not as a separate and unrelated purchase from the shareholder[s]." Mobil then transferred the Esmark shares acquired through its tender offer to petitioner as "proof of payment to Esmark shareholders." Relying on *United States v. Joliet & C.R.*, 315 U.S. 44 (1942), respondent argues that petitioner may not avoid tax on its sale of Vickers to a third party by assigning the proceeds to its shareholders.

*Joliet* involved a railroad "lease" in perpetuity whereby the lessee paid fixed annual amounts to the railroad's shareholders. Applying a Treasury regulation, the Supreme Court held that the railroad was taxable on payments made by the lessee to the shareholders. Upholding the regulation as valid, the Court explained:

> The relationship between * * * [the railroad] and its shareholders is an abiding one. They obtain the dividend payments because of their status as shareholders. All questions of the rights of creditors aside, there can be no doubt that a corporation may normally distribute its assets among its stockholders. When it undertakes to do so, its act is nonetheless a corporate act though its shareholders receive new contractual rights enforceable by them alone against the transferee. That is to say, their rights to receive the proceeds on the disposal of corporate assets are strictly derivative in origin. The fact that the consideration is made distributable to them directly over a long period of time rather than in one lump payment does not alter the character of those rights. In each case their claims to the proceeds flow from the corporation and are measured by the stake which they have in it. * * * [315 U.S. at 48.]

In this case, the rights of petitioner's shareholders were not "strictly derivative in origin," nor were they "measured by the stake" that they had in petitioner. The Esmark shareholders individually sold noncorporate personal assets, i.e., their stock. The shareholders were not simply third party beneficiaries of the exchange agreement; each shareholder possessed an independent claim against Mobil based on Mobil's tender offer. Moreover, the magnitude of each shareholder's claim against Mobil was measured not by the shareholder's stake in petitioner, but by personal willingness to surrender some or all Esmark shares owned. Respondent's assignment-of-income argument thus fails to account for one of the principal results of the Esmark transaction as structured, i.e., the non-pro-rata character of

petitioner's redemption of more than 50 percent of its outstanding stock. That doctrine, therefore, does not apply in this case.

### Mobil's "Transitory" Ownership

Relying on *Helvering v. Bashford,* 302 U.S. 454 (1938), *Idol v.Commissioner,* 38 T.C. 444 (1962), affd. 319 F.2d 647 (8th Cir. 1963), and *United States v. General Geophysical Co.,* 296 F.2d 86 (5th Cir. 1961), respondent contends that Mobil's ownership of petitioner's stock was too transitory to be recognized for tax purposes.

In *Bashford,* a corporation participated in the reorganization of its competitors into a new corporation that became its subsidiary. The Supreme Court held that the parent corporation was not a "party to the reorganization" within the meaning of section 112(1)(2) of the Revenue Act of 1928. Because the "continuity of interest" required in corporate reorganizations was lacking, the taxpayer, who had previously owned stock in one of the parent corporation's former competitors, was taxed on receipt of the parent corporation's stock. Section 311, however, does not contain a "continuity of interest" requirement, and the theory underlying *Bashford* is consequently inapplicable.

*Idol* is superficially similar to this case. In *Idol,* the corporation's sole shareholder, Idol, needed cash to pay off personal debts. Attempting to withdraw cash from his corporation as capital gain rather than as a dividend, Idol sold a portion of his stock to a purchaser interested in acquiring certain corporate assets. Idol then caused the corporation to distribute the assets in exchange for the purchaser's recently acquired shares. We held that the transaction should be treated and taxed as a sale by the corporation of a portion of its assets to the purchaser, followed by a dividend distribution of the sales proceeds to the taxpayer. In so holding, we stated:

Not only is it plain from the evidence before us that * * * [the purchaser] had no interest in acquiring any of * * * [the corporation's] stock, but there is no indication here that Idol had any real desire to dispose of any part of his 42 shares of the corporation's stock. The only reason the transactions were cast in the form of a sale of stock followed by a redemption was the possibility of obtaining favorable tax treatment.

* * * * * * *

Not only does the evidence before us fail to disclose that Idol really wished to dispose of any of his 42 * * * shares or that * * * [the purchaser] desired to acquire them, but it also fails to indicate that * * * [the corporation] had any reason or purpose to reacquire part of its outstanding shares. Petitioners have not established that * * * [the corporation] had a real intention to reduce its capital or to redeem any part of its outstanding stock.

[38 T.C. at 460.]

*Idol* was not decided on the grounds that the purchaser's stock ownership was too "transitory." As petitioner notes, *Idol* is at bottom a simple "earnings bail-out" case. In *Idol*, the only corporate change was that the purchaser acquired the assets disposed of; the sole shareholder continued to own 100 percent of the corporation's stock, and the business remained intact.

*Idol* is also factually distinguishable. In the instant case, more than 50 percent of petitioner's stock was tendered by thousands of public shareholders. As a result, petitioner's equity base was substantially contracted, and the relative holdings of its remaining shareholders were significantly changed. After the transaction, petitioner had completely divested itself of its energy business.

In *Standard Linen Service, Inc. v. Commissioner*, 33 T.C. 1 (1959), a case decided under the 1939 Code, the Model Laundry Co. (Model) was engaged in the laundry and linen supply businesses. Model's wholly owned subsidiary, Standard Linen Service, Inc. (Standard), operated a separate linen supply business. As in this case, a transaction was structured that satisfied the differing needs of three parties. Model experienced liquidity problems and needed additional funds. Several Model shareholders decided to sell their stock and terminate their investment in the company. Alsco, a potential purchaser, had no interest in Model's laundry business, but wished only to acquire specific assets used in the linen supply businesses carried on by Model and Standard. The shareholders, motivated in part by tax considerations, desired a stock sale. Alsco agreed to acquire Model stock from the shareholders at a price equal to the value of the desired assets. Model agreed to liquidate Standard and redeem the purchaser's newly acquired stock with the assets used in the linen supply businesses. Alsco

was not obligated to purchase the stock without assurances that the assets would be delivered in exchange. As agreed, the exchange took place on the same day that the purchaser acquired the stock.

The Commissioner argued that the form of the transaction was chosen solely for tax purposes and maintained that the transaction should be taxed as a sale of assets by Model. We observed that the "substance" of what occurred was difficult to determine because the transaction accomplished three distinct objectives:

At the outset we note that any single approach to this problem presents an inherent difficulty, since the transaction under consideration was designed to and, as we see it, did accomplish three separate and distinct objectives, each of which was actively sought by one of the parties. First, those of Model's stockholders who desired to do so were able to dispose of their individual stock interests in the corporation. Second, Model disposed of the linen supply part of its business, thus raising needed capital with which to liquidate existing obligations and underwrite its plans for future expansion of the remaining laundry business. Third, Alsco acquired Model's much wanted linen supply assets, thereby entering the linen supply business in the Cincinnati area. Consequently, the substance of what occurred conceivably can very well differ depending on the position from which the transactions are viewed. The decision is not an easy one. [33 T.C. at 12-13.]

We held for the taxpayer, concluding that the substance of the transaction was a redemption of stock rather than a sale of assets:

In reaching this conclusion, we have not overlooked the advantages gained by Model as a result of the various transfers. Granted, Model disposed of its linen supply assets, but this disposition was by way of a partial liquidation of its business, and not, as respondent maintains, by way of a sale. The formal steps taken by Model are consistent with this conclusion. Prior to the transaction, Model had 61,795 shares of stock outstanding and was in the linen supply business, owning assets in connection therewith which it valued at some $1,900,000. After the transaction, it had reduced its outstanding stock to 16,319 shares, eliminated its linen supply business, and no longer held its linen supply assets. Subsequently, it retired the 45,476 shares received from Alsco, as well as some 59,872 shares of stock held in its treasury. In addition, it filed an amendment to its articles of incorporation with the State of Ohio to evidence its capital reduction and partial liquidation. Thus it appears to us, that Model intended to and did dispose of its linen supply assets for the stock which Alsco bought from the selling stockholders, and not for cash as now argued by the respondent.

It is also highly significant that, though Alsco parted with cash in the amount of $1,909,992, as a result of the various exchanges, none of that money came into Model's ownership. * * *

Moreover, we cannot agree that the transaction was cast in the form of a stock sale solely to acquire the most favorable tax results. The retiring stockholders primarily wanted to sell their stock, and that, and not tax savings alone, was the reason the transaction took the form it did. As shareholders of a validly existing corporate entity they were entitled to avail themselves of this method of disposing of their interests. Real rights and liabilities were created by virtue of the exchanges which we believe cannot be ignored.

In any event, that the insistence upon a stock sale might have been motivated at least in part by a desire to save taxes is immaterial, for tax reduction by whatever legal means available is a taxpayer's prerogative, and will be honored where, as here, the means employed have substance. [13 T.C. at 13-14.] [9]

The facts of this case resemble those of *Standard Linen.* In this case and in *Standard Linen,* but not in *Idol,* the transaction substantially changed the ownership of the corporation. In this case and in *Standard Linen,* again in contrast to *Idol,* the transaction resulted in the disposition of an entire line of business. Finally, in this case and in *Standard Linen,* unlike in *Idol,* the transaction served important corporate, as well as shareholder, purposes. We conclude that *Standard Linen,,* and not *Idol,* is reliable precedent in this case.

*General Geophysical* is also distinguishable. That case involved a transparent scheme designed to produce cash for corporate shareholders and a stepped up basis in certain assets for the corporation. In *General Geophysical,* the corporation transferred assets to a major shareholder in redemption of stock and then reacquired the same assets on the same day for corporate notes. The basic insubstantiality of the transaction, not the transitory period of the share-holder's "ownership" of the assets, was the basis of the court's decision.

### Mobil's Attributes of Ownership

Respondent next contends that Mobil was not the "bene-ficial" owner of the Esmark shares tendered by petitioner's

---

[9] In *Standard Linen Service, Inc. v. Commissioner,* 33 T.C. 1 (1959), we applied sec. 115(i), I.R.C. 1939, which defined a partial liquidation as simply "a distribution by a corporation in complete cancellation or redemption of a part of its stock."

public shareholders. Respondent relies on a series of cases that in a variety of circumstances determine the ownership of stock by analyzing who had the burdens and benefits of ownership. Several cases cited by respondent involve narrow, rather technical, issues concerning the beneficial ownership of stock in S corporations. See *Speca v. Commissioner,* 630 F.2d 554 (5th Cir. 1980); *Owens v. Commissioner,* 568 F.2d 1233 (6th Cir. 1977), affg. in part and revg. in part 64 T.C. 1 (1975); *Wilson v. Commissioner,* 560 F.2d 687 (5th Cir. 1977); *Pacific Coast Music Jobbers, Inc. v. Commissioner,* 457 F.2d 1165 (5th Cir. 1972), affg. 55 T.C. 866 (1971); *Hook v. Commissioner,* 58 T.C. 267 (1972); *Beirne v. Commissioner,* 52 T.C. 210 (1969). Three other cases address the issue of whether payments made by a corporation to a departing shareholder constitute dividends to the remaining shareholders. See *Yelencsics v. Commissioner,* 74 T.C. 1513 (1980); *Bennett v. Commissioner,* 58 T.C. 381 (1972); *Priester v. Commissioner,* 38 T.C. 316 (1962). Another case involved a corporate middleman that in effect received a commission for its role in the purchase of one corporation by another. See *Rupe Investment Corp. v. Commissioner,* 266 F.2d 624 (5th Cir. 1959). With the exception of *Idol,* which was not decided on this issue, not one of the cases cited by respondent involves facts remotely similar to those before us.

In claiming that Mobil was not a stockholder upon purchasing petitioner's shares pursuant to the tender offer, respondent fails to identify anyone other than Mobil as the "true owner" of the shares. Petitioner's tendering public shareholders surrendered all incidents of ownership upon the closing of the tender offer. They sold out. Petitioner's former shareholders could no longer vote their shares, receive dividends, or sell to anyone else. Most importantly, they could no longer resist petitioner's disposal of its energy segment or its redemption of more than 50 percent of its outstanding stock. As respondent acknowledges in his brief, "The Esmark shareholders occupied the role of outsiders to the exchange [of Vickers for Mobil's Esmark shares] without any power to alter or affect the disposition of the Vickers stock." Mobil, not petitioner's former shareholders, thus enjoyed one of the most important attributes

of ownership, to wit, the right to receive distributions of corporate assets. Mobil, not petitioner's former shareholders, was the beneficial as well as the legal owner of petitioner's stock.

## Mobil as a Conduit

Respondent's fourth ground for disregarding Mobil's ownership of petitioner's shares is that Mobil was a mere "conduit." The issue raised by respondent is essentially the same as that raised in *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), and *Cumberland Public Service Co. v. United States*, 338 U.S. 451 (1950).

In *Court Holding,* the taxpayer distributed property to its shareholders subject to a prearranged sale of the property to a third party. Because the corporation had negotiated the prearranged sale, the Supreme Court found that the shareholders were simply a conduit for the corporation's disposition of its property. The Court accordingly held that the corporation, not its shareholders, was to be taxed on the resulting gain. Five years later, in *Cumberland Public Service,* the Supreme Court respected the shareholders' receipt and ownership of the corporate property when the shareholders, not the corporation, had negotiated the prearranged sale. In each case, the Supreme Court's decision turned upon the identities of the actual parties to the sale.

The subsequent cases cited by respondent retain the distinction established by the Supreme Court in *Court Holding* and *Cumberland Public Service.* The existence of a prearrangement does not necessarily signify the presence of a conduit that is to be disregarded. In order to disregard an entity as a conduit, the entity must be a mere intermediary in a transaction where the true "obligation," legal or otherwise, runs between other parties. See *Blake v. Commissioner,* 697 F.2d 473 (2d Cir. 1982); *Pityo v. Commissioner,* 70 T.C. 225 (1978); *Bennett v. Commissioner, supra; Malkan v. Commissioner,* 54 T.C. 1305 (1970); *Ciaio v. Commissioner,* 47 T.C. 447 (1967).

As respondent views the Esmark transaction, Mobil purchased Vickers for cash, and petitioner then redeemed its publicly held shares for the same cash funneled back through Mobil. Respondent argues that Mobil must there-

fore be disregarded as an intermediary. We have no basis for subscribing to respondent's version of the facts. Petitioner, a publicly held company, could in no way bind its shareholders to an agreement to sell their shares. Each shareholder independently decided to sell or retain Esmark stock. Petitioner was also under no direct or indirect obligation to purchase its public shareholders' stock. Mobil, not petitioner, assumed that burden. In this case, an actual obligation ran between petitioner's tendering shareholders and Mobil. If Mobil may not be disregarded as an intermediary, its purchase of petitioner's stock for cash must be respected; and if Mobil's purchase is respected, the transaction may not be recast as proposed by respondent.

## The Step-Transaction Doctrine

Finally, respondent maintains that Mobil's ownership of the Esmark shares must be disregarded under the step-transaction doctrine. We recently described the step-transaction doctrine as another rule of substance over form that "treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result." *Penrod v. Commissioner,* 88 T.C. 1415, 1428 (1987). Respondent contends that Mobil's acquisition and subsequent disposition of petitioner's shares were simply steps in an integrated transaction designed to result in Mobil's acquisition of Vickers and petitioner's redemption of its stock.

That Mobil's tender offer was but part of an overall plan is not in dispute. The existence of an overall plan does not alone, however, justify application of the step-transaction doctrine. Whether invoked as a result of the "binding commitment," "interdependence," or "end result" tests, the doctrine combines a series of individually meaningless steps into a single transaction. In this case, respondent has pointed to no meaningless or unnecessary steps that should be ignored.

Petitioner had two objectives: a disposition of its energy business and a redemption of a substantial portion of its stock. Three direct routes to these objectives were available:

First, petitioner could have distributed the Vickers stock to its shareholders in exchange for their shares. The

shareholders could then have sold the Vickers stock for cash to interested buyers. See *Commissioner v. Court Holding Co.* and *Cumberland Public Service Co. v. United States, supra.*

Second, petitioner could have sold the Vickers stock for cash and then distributed the cash to its shareholders in exchange for their stock. As appears from our findings (pp. 176-177), however, Mobil might not have been the successful bidder.

Third, the parties could have proceeded as they did, with Mobil purchasing petitioner's stock in a tender offer and exchanging such stock for the Vickers stock.No route was more "direct" than the others. Each route required two steps, and each step involved two of three interested parties. Each route left petitioner, petitioner's shareholders, and the purchaser in the same relative positions. Faced with this choice, petitioner chose the path expected to result in the least tax.

Respondent proposes to recharacterize the tender offer/redemption as a sale of the Vickers shares to Mobil followed by a self-tender. This recharacterization does not simply combine steps; it invents new ones. Courts have refused to apply the step-transaction doctrine in this manner. In *Grove v. Commissioner,* 490 F.2d 241 (2d Cir. 1973), affg. a Memorandum Opinion of this Court, the Commissioner relied on the step-transaction doctrine to recharacterize a donor's gift of stock followed by a redemption of that stock from the donee as a redemption of the donor's shares followed by a gift of cash to the donee. The Court of Appeals stated:

> We are not so naive as to believe that tax considerations played no role in Grove's planning. But foresight and planning do not transform a non-taxable event into one that is taxable. Were we to adopt the Commissioner's view, we would be required to recast two actual transactions—a gift by Grove to RPI and a redemption from RPI by the Corporation—into two completely fictional transactions—a redemption from Grove by the Corporation and a gift by Grove to RPI. Based upon the facts as found by the Tax Court, we can discover no basis for elevating the Commissioner's "form" over that employed by the taxpayer in good faith. "Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot generate events which never took place just so an additional tax liability

might be asserted." *Sheppard v. United States*, [386 Ct. Cl. 982, 361 F.2d 972] *supra*, at 987 [1966)]. [490 F.2d at 247-248.]

See also *Carrington v. Commissioner*, 476 F.2d 704, 709-710 (5th Cir. 1973), affg. a Memorandum Opinion of this Court; *Pityo v. Commissioner, supra; Chamberlin v. Commissioner*, 207 F.2d 462 (6th Cir. 1953), revg. 18 T.C. 164 (1952); *Palmer v. Commissioner*, 62 T.C. 684, 693 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). On the basis of these precedents, we conclude that the step-transaction doctrine may not appropriately be applied in this case.

## III. *Conclusion*

Although much more might be written about each of respondent's attacks on the form of petitioner's transaction, we have refrained from doing so. Stripped to its essentials, this case is a rematch of the principles expressed in *Gregory v. Helvering*, 293 U.S. 465 (1935), the source of most "substance over form" arguments.

In *Gregory*, the United Mortgage Co. (United) held among its assets 1,000 shares of the stock of Monitor Securities Corp. (Monitor). The taxpayer, United's sole shareholder, planned to sell the shares of Monitor and receive the proceeds of the sale. In order to avoid the double tax that would result if United sold the shares and distributed the proceeds as a dividend, the taxpayer had United contribute the stock of Monitor to a new corporation, which issued its stock to the taxpayer. This transaction was within the literal definition of "reorganization" under the law as then in effect. Following this "reorganization," the taxpayer dissolved the new corporation and sold the Monitor stock. The Supreme Court disregarded the form of the transaction as having no independent significance.

The Supreme Court framed the issue for decision as follows:

The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * * [293 U.S. at 469. Citations omitted.]

In *Gregory*, the taxpayer's transaction was not "the thing that the statute intended" because a reorganization, as that term was defined in the statute, did not in fact take place:

Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death. [293 U.S. at 469-470.]

In this case, in contrast, there were no steps without independent function. Each of the steps—the purchase of petitioner's stock by Mobil and the redemption of that stock by petitioner—had permanent economic consequences. Mobil's tender offer was not a "mere device" having no business purpose; the tender offer was an essential element of petitioner's plan to redeem over 50 percent of its stock. Mobil's ownership, however transitory, must thus be respected, and if Mobil's ownership of petitioner's shares is respected, a "distribution with respect to * * * stock" in fact occurred.

But was this transaction truly the "thing that the statute intended?" As discussed above, section 311(a) is said to be the codification of the *General Utilities* doctrine. The rationale behind that doctrine has never been clearly articulated. Presumably, the doctrine represents an attempt to ameliorate the perceived harshness of the two-tier system of corporate taxation. Lewis, "A Proposed New Treatment For Corporate Distributions and Sales in Liquidation," Tax Review Compendium 1643, Staff of House Comm. on Ways and Means, 86th Cong., 1st Sess. (Comm. Print 1959). The doctrine may also rest on the belief that a corporation receives nothing of value for its assets when it makes a dividend distribution or redeems its stock with property. In

*Houston Bros. Co. v. Commissioner,* 21 B.T.A. 804 (1930), the Board of Tax Appeals explained the principle as follows:

It is quite possible that, by disposing of some of its assets in exchange for or retirement of some of its outstanding shares, a corporation may be in a stronger financial position than before. But this means only that the distributive interests of its shareholders have been potentially improved. The assets of the corporation itself are not more or of greater value. They are actually less, and only the proportionate value of the shares still in the hands of shareholders has been increased. Before it can be said that the corporation has profit, it must be found not only that it has disposed of its property, but that it has received assets of greater value than the cost of those disposed of. But since a corporation's own shares are not assets, but only the convenient machinery for evidencing shareholder interests, it is a fallacy to say it has received anything and *a fortiori* that it has received a gain. * * * [21 B.T.A. at 815.]

In *United States v. General Geophysical Co.,* 296 F.2d 86 (5th Cir. 1961), the Court of Appeals for the Fifth Circuit used similar reasoning to explain section 311(a):

The rule may be easily justified by the fact that when a corporation transfers appreciated property to its shareholders, as a dividend or in exchange for their shares, the gain created by the appreciation has not accrued to the corporation and should not be taxed to it. [296 F.2d at 88. Fn. ref. omitted.]

The focus of section 311(a) is on the position of the corporation before and after the transaction rather than on the identity of the shareholder who surrendered stock. Given this explanation of the "policy" behind the *General Utilities* doctrine, we cannot say that petitioner's transaction was not "the thing that the statute intended."

In an economic sense, there is no difference between the form chosen by petitioner and the "substance" alleged by respondent. In this instance, however, tax treatment is dictated by form. That this situation is far from unusual is illustrated by the Supreme Court's decisions in *Court Holding* and *Cumberland Public Service*. As the Court noted in the latter case:

The oddities in tax consequences that emerge from the tax provisions here controlling appear to be inherent in the present tax pattern. For a corporation is taxed if it sells all its physical properties and distributes the cash proceeds as liquidating dividends, yet is not taxed if that property is distributed in kind and is then sold by the shareholders. In

both instances the interest of the shareholders in the business has been transferred to the purchaser. * * *

Congress having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate. * * *

[338 U.S. at 455-456.]

We, too, must accept the mandate of Congress, particularly where the corporation is publicly and not closely held. Congress resolved the *Court Holding* issue by enacting section 337. For future years, Congress has resolved the issue presented in this case by abolishing the *General Utilities* doctrine altogether. Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085. In 1980, however, petitioner was entitled to rely on the literal language of section 311, and the judicially recognized doctrines give us no satisfactory basis for taxing the transaction as if something else had occurred. See *Grove v. Commissioner, supra.* We have carefully considered the arguments of the parties set forth in their excellent briefs. We believe that ad hoc extension of doctrine to achieve a result on any of the difficult issues in this case is unwarranted and unwise.

To reflect the foregoing,

*Decision will be entered under Rule 155.*